UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
UNITED STATES,                                        :
                                                      :
                                                      :     **ORDER**
            -against-                                 :     04-CR-994 (DLI)
                                                      :
LUIS VALENTINE,                                       :
                                                      :
                        Defendant.                    :
------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

Defendant Luis Valentine is charged with possession of drugs with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and unlawful possession of firearms by a convicted felon, in violation of 18 U.S.C. § 922(g). Before the court is defendant's motion to suppress the drugs recovered from his car, drugs and guns recovered from his apartment, and several post-arrest statements. For the reasons set forth below, defendant's motion to suppress is denied in its entirety.

## I. FINDINGS OF FACT

The court held a two-day hearing on September 13 and 27, 2005,[1] at which the government presented five witnesses: United States Drug Enforcement Agent Christopher Banzer ("Agent Banzer") and Special Agent Robert J. Yoos ("S.A. Yoos"), New York City Police Department ("NYPD") Detectives Michael Johnson ("Det. Johnson") and Paul Crockett ("Det. Crockett"), and NYPD Sergeant Allan Hoehl ("Sgt. Hoehl"). All were assigned to the Drug Enforcement Agency ("DEA") office housed at John F. Kennedy International Airport ("JFK Airport"). Annette Morales ("Morales"), who lives and has a child-in-common with defendant, testified on his behalf. The defendant did not testify.

---

[1] "Tr. at __" refers to the hearing transcript.

The court finds all of the government's witnesses credible and credits Morales' testimony only to the extent that it corroborates the testimony of the government's witnesses. Otherwise, the court finds Morales' testimony incredible.

*The Controlled Delivery*

On October 8, 2004, a shipment of fifty (50) kilograms of cocaine, concealed in a sofa and loveseat, arrived at the Federal Express ("FedEx") facility at the JFK Airport in the Eastern District of New York. The shipment was addressed to Luis Lebron at 377 Vernon Avenue, basement level apartment, Brooklyn, New York. DEA agents intercepted the delivery at JFK Airport and planned a controlled delivery of the sofa and loveseat. (Tr. at 14-15.)

On October 11, 2004, a field team of DEA agents attempted to execute the controlled delivery. Agents were posted at various locations in the vicinity of 377 Vernon Avenue. (Tr. at 63.) Inside a surveillance van parked across the street from 377 Vernon Avenue, agents used video and audio equipment to record the activity in the immediate vicinity of 377 Vernon Avenue before, during, and some time after the attempted controlled delivery.[2] (Tr. at 17.)

In the early afternoon of October 11, 2004, Agent Banzer and NYPD Detective Rodney Perez ("Det. Perez") attempted to deliver the sofa and loveseat. Posing as FedEx couriers, they arrived in a truck at 377 Vernon Avenue, a multi-level residential building with a basement level apartment. (Tr. at 15-16.)

Once outside of the truck, Agent Banzer observed defendant get out of a white Ford Taurus parked several feet away from 377 Vernon Avenue. Agent Banzer saw defendant signal to another

---

[2] A videotape of the recording was admitted in evidence as Government's Exhibit No. 2.

person down the street and heard him yell "Paolo"[3] to a man later identified as Pedro Rodriguez, as if to let him know that FedEx had arrived. (Tr. at 19, 69.) Then, another individual, who identified himself only as "Angel," approached Agent Banzer and Det. Perez. (Tr. at 20.) Angel had a protracted discussion with Det. Perez about the delivery during which Angel used his cell phone to call someone purporting to be Luis Lebron. Angel handed his cell phone to Perez. Meanwhile, defendant entered and exited 377 Vernon Avenue and walked towards his white Ford Taurus. (Tr. at 21, 41.)

Ultimately, no one signed for the delivery and Agent Banzer and Det. Perez got back inside their truck. (Tr. at 25, 27.) Before leaving, Det. Perez walked up to the doorway of 377 Vernon Avenue. Defendant, who lives in the second floor apartment of 377 Vernon Avenue, answered the door. Det. Perez engaged defendant in a conversation, but this conversation was not recorded, and Agent Banzer could not testify as to its sum and substance. Agent Banzer and Det. Perez left the scene at approximately 12:20 p.m. (Tr. at 45, 47, 56.)

*Surveillance After the Controlled Delivery*

After the controlled delivery failed, S.A. Yoos, a DEA special agent with twenty years of experience, continued to patrol the area in an unmarked car. Det. Johnson, a seven-and-a-half year veteran of the NYPD, continued to monitor the area from the surveillance van parked across the street from 377 Vernon Avenue. Both men observed several individuals standing around on Vernon Avenue. They saw defendant walking on Vernon Avenue and observed some unidentified males, who until then had been waiting at various spots along and across the street, converge on and follow the defendant through a fence and into a vacant lot. The videotape shows defendant in conversation

---

[3] Defendant may have said "Viejo," which means old man in Spanish. (Tr. at 9.)

3

with these individuals. Neither S.A. Yoos nor Det. Johnson were able to observe what transpired in the lot. However, several minutes later, S.A. Yoos and Det. Johnson saw defendant walking alone on Vernon Avenue, a beverage in hand. S.A. Yoos and Det. Johnson testified that, based upon their training and experience, defendant's conduct, together with the surrounding circumstances, led them to believe that defendant had engaged in the sale of narcotics. (Tr. at 93-95.) Their testimony is corroborated by the videotape in evidence. *See* Gov't's Ex. No. 2.

*Valentine's Arrest and the Search of his Car*

At approximately 1:30 p.m., Sgt. Hoehl and Det. Crockett arrested defendant, as he stood near the rear of his white Ford Taurus. They approached defendant from different directions, displayed their shields, and identified themselves as police officers. Upon being informed that he was under arrest, defendant violently struggled—at one point reaching for Sgt. Hoehl's gun. Members of the field team assigned to the surveillance van poured out of the van to assist Sgt. Hoehl and Det. Crockett in the arrest.

After the agents and officers subdued and arrested the defendant, Det. Johnson searched defendant's white Ford Taurus for weapons and contraband. He recovered several glassines of heroin from a grey sweatshirt he found in the front passenger seat of defendant's car. (Tr. at 169, 204.) This was the same grey sweatshirt defendant had been wearing when he was observed earlier by S.A. Yoos and Det. Johnson.

*The Search of Valentine's Apartment*

S.A. Yoos, Sgt. Hoehl, and Det. Crocket proceeded to defendant's second floor apartment at 377 Vernon Avenue. (Tr. at 99, 220, 239; 260-261.) Morales, who was still in her sleepwear, answered the door. S.A. Yoos identified himself and his two companions as federal agents and

4

police officers and informed Morales that they were "working on a narcotics case." He explained that he did not want to talk to Morales in the hallway and asked for permission to enter the premises. Morales appeared nervous but calm and told them to come into the apartment. No weapons were drawn, no voices were raised, and no threats were made. (Tr. at 99, 220-221, 243, 247, 250, 261.)

Accounts of what happened next significantly differ. According to the government's witnesses, S.A. Yoos informed Morales that defendant had been arrested for narcotics violations and asked for her assistance. When Morales denied that there were any drugs or guns in the apartment, S.A. Yoos asked for permission to search the apartment. Morales agreed to allow the search. S.A. Yoos then produced a Consent to Search Form ("Consent Form"),[4] read it, explained the purpose of the search, and asked her to sign it. She agreed and signed the form. Thereafter, the apartment was searched. While agents searched the apartment, Morales continued to deny that there was any contraband in the apartment until the agents recovered ammunition. Morales then admitted that there were guns in the bedroom and directed the agents to the weapons. The search lasted about an hour. (Tr. at 99-101, 104-105, 197, 220-221, 243, 247, 250.)

According to Morales, the Consent Form was produced only after the search was conducted and after one of the agents, presumably S.A. Yoos, misled Morales about the purpose of the search. Morales contends that S.A. Yoos claimed to be searching for two individuals the agents allegedly had seen leaving her apartment prior to the agents' arrival. According to Morales, S.A. Yoos did not explicitly ask to search for any contraband and the search lasted for about six hours.

The agents, totaling five, recovered, *inter alia*, a sawed-off shotgun, two handguns, and

---

[4] Gov't's Ex. No. 1.

5

heroin bags from the bedroom.[5] Morales was placed under arrest. (Tr. at 106-107.)

*Valentine's Statements*

Agent Banzer interviewed the defendant at 8:00 p.m. in the DEA offices at JFK Airport. The time between defendant's arrest and his interview was spent processing the arrests of the defendant and three others who were arrested in connection with the investigation at 377 Vernon Avenue.[6] (Tr. at 172, 174-175, 270.) Agent Banzer advised defendant of his Miranda rights and the defendant indicated that he understood them. (Tr. at 48-52, 176, 271, 286.) Defendant made several statements: (1) he didn't know Pedro Rodriguez; (2) the individual to whom he had signaled, known to him only as "old man," had told defendant that he was expecting a FedEx delivery; and (3) he had no knowledge of the shipment of cocaine concealed in the sofa and loveseat. (Tr. at 53.)

## II. CONCLUSIONS OF LAW

A.   *Probable Cause for Valentine's Arrest*

The defendant contends that his actions before, during, and after the controlled delivery are insufficient to establish probable cause for his arrest. Therefore, the physical evidence seized and his post-arrest statements should be suppressed as fruit of the poisonous tree.

Pursuant to *Dunaway v. New York*, 442 U.S. 200, 208, 99 S. Ct. 2248, 2254, 60 L. Ed. 2d 824 (1979) and its progeny, probable cause for an arrest exists when "officers have knowledge or reasonably trustworthy information of facts and circumstances that ... warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be

---

[5] At some point, an additional two agents arrived at the apartment and assisted in the search. (Tr. at 199.)

[6] A copy of a card listing the Miranda warnings and read by Agent Banzer to the defendant was admitted into evidence at Gov't's Ex. No. 3.

6

arrested." *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983)(*citing Dunaway v. New York*, 442 U.S. 200, 208, 99 S. Ct. 2248, 2254, 60 L. Ed. 2d 824 (1979); *Wong Sun v. United States*, 371 U.S. 471, 479, 83 S. Ct. 407, 412, 9 L. Ed. 2d 441 (1963); *Brinegar v. United States*, 338 U.S. 160, 175, 69 S. Ct. 1302, 1310, 93 L. Ed. 1879 (1949)).

The evidence at the hearing established that, before and during the controlled delivery, the defendant talked to Pedro Rodriguez in front of 377 Vernon Avenue; entered and exited his white Ford Taurus and 377 Vernon Avenue several times; summoned Pedro Rodriguez to let him know that FedEx had arrived when Agent Banzer and Det. Perez pulled up in their truck; and responded to Det. Perez when Det. Perez asked for his assistance in effecting delivery of the furniture.

In *United States v. Fisher*, upon which defendant relies, the Second Circuit characterized defendant's conduct in that case as too ambiguous to provide probable cause for an arrest—he was seen emerging from a house located on a street where one of the other suspects lived, walking northward a few feet, hesitating, and then walking northward again. 702 F.2d at 377.

While the court agrees with the defense that, standing alone, defendant's conduct, up until the failed controlled delivery, was too ambiguous to give rise to probable cause for an arrest, the totality of the circumstances, including defendant's conduct after the delivery attempt, amply supports the court's conclusion that there was probable cause for defendant's arrest.

After the failed delivery, S.A. Yoos and Det. Johnson both observed defendant entering and exiting 377 Vernon Avenue. They also observed unidentified males waiting on Vernon Avenue. When defendant appeared, this time wearing the grey sweatshirt later found in the passenger seat of defendant's car, he gestured to them to approach, and "everyone came together." They walked as a group, conversed, and entered an empty lot through a fence. Eventually, defendant re-emerged,

7

alone, with a beverage in hand, walking along Vernon Avenue from a different direction. Valentine then went in and out of his white Ford Taurus that was parked several feet from 377 Vernon Avenue. (Tr. at 164, 167.)

Detective Johnson testified that, as an undercover officer, he would sit in front of target locations, along with other individuals, waiting for a dealer to purchase narcotics. The dealer would "come down and do everybody at once because it was less chance of him getting caught by the police. So, if he would come down, we would all get done together. We'd all go our separate ways." (Tr. at 165-166.) Det. Johnson also explained that dealers often purchased items from stores immediately after consummating drug sales in an effort to rid themselves of any pre-recorded buy money they might have obtained as a result of selling narcotics: "So a lot of times, our investigators would have to go into these bodegas and get our 'buy' money back and change—and give them regular twenties and get our 'buy' money back from inside the cash register." (Tr. at 180-181.) Based upon his training and experience, Det. Johnson concluded that Valentine had engaged in narcotics transactions while in the vacant lot. (Tr. at 166.) The government's videotape wholly substantiates his testimony as well as that of S. A. Yoos, who testified to substantially the same facts and conclusions. *See* Gov't's Ex. No. 2.

Based on the credible testimony of Det. Johnson and S.A. Yoos, and the videotape in evidence, the court finds that defendant's arrest was proper as there was probable cause to believe that Valentine had engaged in narcotics sales.

B. *The Search of Valentine's Car*

Defendant argues that the heroin recovered from his car should be suppressed because the search of his car was unconstitutional. The government contends that the search of the car was

lawful as a search incident to defendant's arrest and pursuant to the "automobile exception" to the Fourth Amendment warrant requirement. The court finds that the search was proper as incident to defendant's lawful arrest.

1. *Search Incident to Arrest*

Under *New York v. Belton*, when an occupant of a car is lawfully arrested, a search of the passenger compartment of that car falls within the ambit of a search incident to arrest. 453 U.S. 454, 460, 101 S. Ct. 2860, 2864, 69 L. Ed. 2d 768 (1981). In *New York v. Belton*, a police officer pulled defendant's car over for speeding. As the officer approached Belton's car, he smelled marijuana and observed what he believed to be an envelope of marijuana on the floor of the car. All four occupants were removed from the car. The officer removed Belton's jacket from the front seat of the car and recovered cocaine from one of its pockets. The Supreme Court held that, "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *Belton*, 453 U.S. at 460, 101 S. Ct. at 2864.

Defendant Valentine argues that, in contrast to *Belton,* where the probable cause to arrest the defendant developed based upon marijuana observed inside of Belton's car, the probable cause to arrest here was based on occurrences outside of defendant's car. Defendant contends that "[t]o expand *Belton* to include situations in which probable cause to arrest developed while the suspect was out of the car, is to stretch the reasoning of *Belton* beyond its logical limits." (Def.'s Post-Hearing Mem. 32.)

As further support for the proposition that a search of an automobile is valid only when incident to a seizure resulting from a traffic stop, defendant mistakenly cites *Thornton v. United*

9

*States*, 541 U.S. 615, 1244 S. Ct. 2127, 158 L. Ed. 2d 905 (2004). In *Thornton,* a police officer observed the defendant driving a car. A license check revealed that defendant's license plate did not match the car he was driving. By the time Police Officer Nichols reached defendant, the defendant had parked the car and left it. Nichols approached Thornton, asked for consent to frisk him, and recovered marijuana and crack cocaine from Thornton's jacket. After arresting Thornton, Nichols searched Thornton's car and recovered a gun from underneath the driver's seat. In finding that the search of Thornton's car was incident to his arrest, the Supreme Court refused to limit vehicle searches to instances where a police officer initiated contact with a suspect who was still inside the vehicle.

Neither *Belton* nor *Thornton* support Valentine's argument. In both cases, the Supreme Court's rationale for allowing the vehicle searches turned on security and evidentiary concerns: "In all relevant aspects, the arrest of a suspect who is *next to a vehicle* presents identical concerns regarding officer safety and the destruction of evidence as the arrest of one who is inside the vehicle." *United States v. Thornton*, 541 U.S. 615, 124 S. Ct. at 2131 (emphasis added). Similarly, the arrest of a suspect based upon probable cause that developed outside of the vehicle presents identical concerns as the arrest of one who was arrested based upon probable cause developed while the suspect was inside the vehicle.

The critical factors supporting the search of the vehicle in the instant case are (1) the probable cause for defendant's arrest and (2) defendant's recent occupancy of the car. "Once an officer determines that there is probable cause to make an arrest, it is reasonable to allow officers to ensure their safety and to preserve evidence by searching the entire passenger compartment." *Id.* at 2132. As already discussed, defendant's arrest was supported by probable cause. Therefore, the

search of defendant's car was proper as a search incident to his arrest. Accordingly, his motion to suppress the heroin recovered from the sweatshirt found inside of his car is denied.

2. *Automobile Exception*

The government invokes the automobile exception to the warrant requirement as an additional ground justifying the search of Valentine's car. Because the court concludes that the search of the car was proper as incident to Valentine's valid arrest, the court declines to address this argument.

C. *Search of Valentine's Apartment*

Defendant argues that the search of his apartment was unconstitutional because it was based on an involuntary consent to search and the search exceeded the scope of the consent. He argues that the consent was involuntary because the agents threatened Morales with the loss of her children if she did not consent. The government argues that its witnesses were credible in contrast to Morales who has a motive to lie about the voluntariness of her consent.

So long as the authorities have the voluntary consent of an authorized person, a warrantless search of a home does not violate the Fourth Amendment. *United States v. Elliot*, 50 F.3d 180, 185 (2d Cir. 1995) (*citing Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S. Ct. 2041, 2045, 36 L. Ed. 2d 854 (1973). The government is required to prove, by a preponderance of the evidence, that the consent was voluntary. *See United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981). To determine voluntariness, courts in this circuit consider the totality of the circumstances, *Schneckloth*, 412 U.S. at 227, 93 S. Ct. at 2048, and examine whether there is a reasonable basis to believe that an individual has consented to a search. *United States v. Isiofia*, 370 F.3d 226, 231 (2d Cir.2004) (*quoting Schneckloth*, 412 U.S. at 227, and *United States v. Garcia*, 56 F.3d 418, 423 (2d

11

Cir. 1995)).

Here, though Morales does not dispute that she permitted the agents to enter her apartment, she claims that she thought the agents were going to conduct a brief and cursory search for two individuals. She further testified that she did not intend to allow the agents to search the entire apartment. (Tr. at 307.)

The standard for determining the voluntariness of a consent to search is an objective one. Therefore, Morales' alleged consent must be analyzed from the point of view of an objective reasonable person rather than from her subjective point of view. *See Garcia*, 56 F.3d at 423. Applying this standard to the facts of this case, the court finds that Morales' consent to search was voluntary.

Morales concedes that when she permitted the agents to come into her apartment, she also granted them permission to "take a look." (Tr. at 307, 330.) They were not yelling, nor were their guns drawn. (Tr. at 323, 330.) She concedes that she never objected or sought to restrict their search. (Tr. at 324.) This testimony is corroborated by that of S.A. Yoos, Det. Johnson, and Sgt. Hoehl. (Tr. at 101, 205, 246-247.) On this record, the court finds that the agents were reasonable in their belief that Morales voluntarily consented to the search.

Morales' testimony concerning when she signed the Consent Form was confused and equivocal. On the one hand, she claimed to have signed it after the agents found the guns and after they threatened her with the loss of her children. Yet, she also testified that she signed the Consent Form before the agents found the guns.

> **Defense Counsel**: Okay. When they told you you had to sign this, what did they say to you, again?
> **Morales**: They said I have a family, I have kids. And they—whatever they found *after that*, it was going to be on me, I could lose, you know, my kids. I love my kids.

12

> . . .
> **The Court:** If you can repeat that again, your answer again?
> **Morales**: Okay. They say that—okay. When they found the guns and they say we found whatever, right. So you need to sign this paper because *whatever we found after this* is going to be on you. You have kids. You have a family. You know, you could lose your kids and that's it.
> **Defense Counsel**: Let's talk about that. Did someone say something to you about losing your kids?
> **Morales**: Yes.
> **Defense Counsel**: Do you know who that was?
> **Morales**: I don't remember.
> . . .
> **Defense Counsel**: Again, let me ask you this, this paper you signed, Government Exhibit 1, are you sure that you didn't sign that until after they had shown you the guns that they said they found in there?
> **Morales**: Before. I mean, before they found it, I signed the paper.

(Tr. at 313-314; emphasis added.)

The court further notes that Morales, who has lived with the defendant for twelve years and has an eight-year-old child in common, testified that she sought to help the defendant through her testimony. (Tr. at 334-335.)

On the issue of the consent's timing, the court credits the testimony of the government's witnesses who testified that, before the agents commenced their search for contraband, Morales signed the Consent Form, which explicitly indicated that her apartment was to be searched. Set forth on the Consent Form were the following two declarations: (1) "I have not been threatened or forced in any way," and (2) "I freely consent to the search." Morales, who understands English, said she read the Consent Form and signed it. (Tr. at 334.) At the time, she was neither handcuffed nor under arrest. She concedes that no weapons were drawn and no voices were raised. (Tr. at 220-221, 243, 247, 250.) After the agents completed the search, ultimately recovering three firearms and additional drugs, Morales was arrested.

Defendant argues that Morales read the Consent Form and signed it only because the agents

13

warned Morales that her failure to sign the Consent Form might result in the loss of her children. *United States v. Eggers*, 21 F.Supp.2d 261, upon which defendant relies, is clearly distinguishable. The defendant in that case was arrested and refused to grant secret service agents permission to search her home. One of the agents, Agent Atkinson, allegedly told her that "97 percent of the people that we arrest are convicted." The defendant was permitted to call her attorney who advised her to remain silent except to deny agents permission to search her home. Agent Atkinson informed her that he had enough to get a warrant anyway and that defendant's home would be sealed a day or two until he obtained the warrant, preventing her children from going inside. The defendant then consented.

In the instant case, Morales never objected to the search. She was neither handcuffed nor under arrest while the agents sought her consent, and the agents never threatened her or the well being of her children. Det. Crockett testified that during S.A. Yoos' conversation with Morales, he interjected several times to emphasize the importance of removing any guns or drugs from the apartment because there were children living there. (Tr. at 262.) The court credits his testimony and finds that his statements cannot be viewed as threatening to either Morales or her children.

Based on the totality of the circumstances the court finds that Morales voluntarily consented to the search of her apartment.

D.     *Valentine's Statements*

Rather than challenging the voluntariness of the Valentine's post-arrest statements, the defense argues that Valentine's statements should be suppressed as the fruit of an illegal arrest. Since the government has established that the arrest was lawful, *see supra* section II. A, the court denies defendant's motion to suppress his statements.

In any event, based on the totality of the circumstances, the court finds that defendant's statements were made voluntarily. *See United States v. Bye*, 919 F.2d 6, 9 (2d Cir. 1990) (holding that voluntariness assessment must be based on the totality of the circumstances). Defendant Valentine does not dispute that *Miranda* warnings were timely given nor does he claim that his statements were physically coerced. Det. Johnson credibly explained that the delay between Valentine's arrest and his post-arrest interview was caused by the lengthy arrest processing procedures for the four individuals arrested pursuant to the same investigation and the limited processing facilities at the DEA JFK Airport offices.

Accordingly, defendant's motion to suppress his statements is denied.

### III. Conclusion

For the reasons set forth above, defendant's motion to suppress the guns, drugs, and statements is denied in its entirety.


DATED:   Brooklyn, New York
         January 24, 2005

                                         _____
                                              DORA L. IRIZARRY
                                           United States District Judge