```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
UNITED STATES OF AMERICA,                :
                                         :
                    Plaintiff,           :
                                         :        **MEMORANDUM AND ORDER**
           -against-                     :            04-CR-994 (DLI)
                                         :
LUIS VALENTINE,                          :
                                         :
                    Defendant.           :
----------------------------------------------------------------x
```

**DORA L. IRIZARRY, United States District Judge:**

Defendant was charged with one count of possession of drugs with intent to distribute, in violation of 21 U.S.C. § 841(a), and one count of unlawful possession of firearms by a convicted felon, in violation of 18 U.S.C. § 922(g). Defendant moved to suppress the evidence supporting these charges, contending that the law enforcement officers lacked probable cause to arrest him, and that the evidence, which was obtained during subsequent warrantless searches of his vehicle and home, must be suppressed as the fruit of the poisonous tree. Defendant further contended that his wife's consent to search the apartment was invalid. The court denied his motion, holding that the law enforcement officers had probable cause to arrest him and that the wife's consent to search was given knowingly and voluntarily. *See generally United States v. Valentine*, 04-CR-994 (DLI), 2006 WL 195005 (E.D.N.Y. Jan. 24, 2006). Defendant then pled guilty to the firearms charge, reserving the right to appeal this court's denial of his suppression motion. On appeal, the Second Circuit vacated this court's order denying suppression and imposing sentence on defendant's guilty plea. The Second Circuit also remanded the matter for this court's determination as to whether the wife's consent to search the apartment had become so attenuated

that the taint from defendant's illegal arrest had dissipated. *See generally United States v. Valentine*, 539 F.3d 88 (2d Cir. 2008).

This Order addresses two issues on remand: (i) whether there is evidence establishing that the events leading up to the consent to search defendant's apartment dissipated the taint of defendant's illegal arrest, and (ii) whether additional fact finding is necessary to resolve this issue. As set forth more fully below, the court answers both questions in the negative and grants defendant's motion to suppress the evidence recovered from his apartment.

## BACKGROUND[1]

On October 8, 2004, a shipment of fifty kilograms of cocaine, concealed in a sofa and loveseat, arrived at the Federal Express facility at JFK Airport. The shipment was addressed to Luis Lebron, at the basement apartment in 377 Vernon Avenue, Brooklyn, New York. United States Drug Enforcement Administration ("DEA") agents intercepted the delivery and attempted a controlled delivery of the sofa and loveseat on October 11, 2004. (*See* Transcript, Supp. Hrg., Sept. 13 and 27, 2005 ("H.") at 14-15.) Mr. Lebron was not home and, although the undercover DEA agents discussed the delivery with individuals on the street at the time of the delivery attempt, including defendant, no one signed for the package. The DEA continued to observe activity on the street that day, and ultimately arrested defendant. A search of defendant's car revealed several glassines of heroin. Special Agent Robert J. Yoos, along with other officers, proceeded to the apartment shared by defendant and his common-law wife, Annette Morales. Morales consented, orally and in writing, to a search of their apartment. The agents found

---

[1] For a detailed discussion of the factual background in this case, see *Valentine*, 2006 WL 195005. The factual discussion in this Order is limited to that which is necessary to address the issues on remand.

several firearms and heroin. Shortly thereafter, a grand jury issued an indictment, charging defendant with narcotics and firearms offenses.

Defendant moved to suppress the evidence that the grand jury relied upon to indict him, contending that: (1) the law enforcement officers lacked probable cause to arrest him; (2) the warrantless searches of his car and his apartment were tainted by his unlawful arrest; and (3) Morales had not knowingly or voluntarily consented to the search of their apartment. The court conducted a suppression hearing, taking testimony from Morales and several law enforcement officers and viewing a videotape of the events as recorded by the agents from the street on October 11, 2004. The court denied defendant's motion, finding that the law enforcement officers had probable cause to arrest him. Therefore, the search of his car was lawful as incident to his arrest. The court also found that Morales's consent was given knowingly and voluntarily. Because the court found that the arrest was lawful, it did not consider attenuation. *See generally Valentine*, 2006 WL 195005. On February 28, 2006, defendant pled guilty to the firearms charge pursuant to a plea agreement wherein he reserved his right to appeal the denial of his suppression motion. On December 7, 2006, defendant was sentenced, *inter alia*, to ten years of imprisonment and three years of supervised release with special conditions.

On appeal, the Second Circuit vacated this court's order denying suppression and imposing sentence, and remanded, holding that the officers lacked probable cause to arrest defendant. *See Valentine*, 539 F.3d at 95 (holding that "the cumulative record is insufficient as a matter of law to 'warrant a man of reasonable caution in the belief' that Valentine committed a crime"). The Second Circuit further held that the subsequent search of Valentine's car "stemmed from [the] illegal arrest" and, thus, "the evidence seized from that search must necessarily be suppressed as the fruit of the poisonous tree." *Id*. at 96. The Second Circuit highlighted that

defendant's firearms conviction arose out of evidence located in his apartment during a post-arrest search, not evidence located in his car. *Id*. The firearms conviction could only be supported if "Morales's consent to search the apartment 'had become so attenuated as to dissipate the taint' from the illegal acts leading up to that search." *Id* (citations omitted). Otherwise, held the Circuit, "the firearms found inside the apartment must also be suppressed as the fruit of the poisonous tree." *Id*. The Second Circuit remanded for resolution of this issue and additional fact finding, if necessary. *See id*. n.10. On remand, the parties briefed the issue of whether additional fact finding was necessary and provided the court with letter briefs submitted on appeal on the issue of attenuation. Oral argument was held on December 3, 2008. (*See* Transcript, Oral Arg., Dec. 3, 2008 ("Tr.").)

## DISCUSSION

**I.     Legal Standards**

It is well-settled that evidence obtained pursuant to an unlawful seizure or search must be suppressed as the fruit of the poisonous tree. *See, e.g.*, *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963). This doctrine precludes the admission of primary, secondary or derivative evidence. *See id*. An unlawful arrest will invalidate a defendant's subsequent consent to search, unless the government can demonstrate that events occurring after the unlawful arrest sufficiently dissipated its taint. *See United States v. Ceballos*, 812 F.2d 42, 50 (2d Cir. 1987) (holding that defendant's consent to search following an unlawful arrest did not become so attenuated as to dissipate the taint associated with the arrest); *see also United States v. Vasquez*, 638 F.2d 507, 528 (2d Cir. 1980) ("[T]he government must show that the subsequent consent was sufficiently an act of free will to purge the primary taint of the unlawful invasion.") (internal quotation marks omitted). The government "bears the burden of proving a break in the causal

chain." *Ceballos*, 812 F.2d at 50. Absent a showing of attenuation, courts must exclude the tainted evidence.

The Supreme Court set forth four factors relevant to an attenuation analysis in *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975) (reversing and holding that the defendant's post-arrest confession was not sufficiently attenuated from the unlawful arrest). To determine whether sufficient attenuation exists between an unlawful arrest and the subsequent discovery of evidence, such that the evidence obtained may be admitted at trial, courts must consider: (1) whether a *Miranda* warning was given; (2) the temporal proximity of the illegal stop and the alleged consent; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the illegal stop. *See Brown*, 422 U.S. at 603-04; *United States v. Oguns*, 921 F.2d 442, 447 (2d Cir. 1990). Courts have applied these same four factors to various scenarios, including when a defendant consents to a search of his or her home after what is later determined by a court to be an unlawful arrest. *See Ceballos*, 812 F.2d at 49-50; *accord United States v. Delgado*, 797 F. Supp. 213, 220-21 (W.D.N.Y. 1991) (holding that "defendant's consent to the search of the package was tainted by the unlawful arrest"). "Generally, the primary taint remains unpurged in instances where the consents to search . . . were too closely connected in context and time to the illegal arrest to break the chain of illegality." *Delgado*, 797 F. Supp. at 220 (citing *Ceballos*, 812 F.2d at 50).

## II. Analysis

### A. The Government's Motion to Reopen the Suppression Hearing

On remand, the government seeks to reopen the suppression hearing to present additional evidence bearing on the lawfulness of the consent search conducted at defendant's apartment. Specifically, the government seeks to introduce evidence of a DEA policy governing the

protocols agents must follow when executing controlled deliveries. According to the government, under this policy, when "surveillance becomes known to persons connected to a suspected drug location" agents should: (i) obtain consent to search the premises; (ii) seek search warrants for those apartments for which consent was not obtained; and (iii) continue to monitor those premises until search warrants are obtained. (Gov't Mot. to Reopen Supp. Hrg. at 4.) The government contends that this policy is relevant to the fourth factor—whether their search of the apartment was a flagrant violation of the law—as the policy is legitimate and the DEA obtained Morales's consent as they did the consent of other residents in the building in accordance with the policy and not in exploitation of defendant's arrest. (*Id.*)

The court declines to reopen the suppression hearing to take this evidence. *See United States v. Bayless*, 201 F.3d 116, 131-32 (2d Cir. 2000) (holding that the decision to reopen a suppression hearing lies soundly within the discretion of the district court). As discussed below, the government has no additional evidence demonstrating that there was probable cause for the search of defendant's apartment. The government's proffer of the DEA policy may support a finding that the agents were not acting in bad faith, but it is sheer speculation to believe that they would have acted pursuant to the policy and sought a search warrant for defendant's apartment. Moreover, as set forth below, even if the court fully credits as accurate and credible the government's assertions regarding the existence and contents of this DEA policy, the proffered evidence would not alter the court's attenuation analysis. Thus, it would be futile to reopen the suppression hearing for the sole purpose of introducing the proffered DEA policy. *See United States v. Pena Ontiveros*, 07-CR-804 (RJS), 2008 WL 2446824, *4 (S.D.N.Y. Jun. 16, 2008) (declining to reopen a suppression hearing as "it is clear that reopening the suppression hearing

would be futile, and would not provide any justification for a modification of the Court's order suppressing" certain evidence).

Initially, the government also sought to introduce this evidence in support of its argument that discovery of the firearms was inevitable because, if Morales had refused to consent, the agents, in accordance with the dictates of this policy, would have obtained a search warrant. (*See* Gov't Mot. to Reopen Supp. Hrg. at 5.) As noted by the court during oral argument, this theory necessarily presumes that there was independent probable cause to believe that evidence of narcotics and/or firearms possession would be found in the apartment that would justify a judge's issuance of a search warrant. However, there is nothing in the record of the suppression hearing, and the government did not provide additional evidence in support of the instant motion, which suggests such evidence exists. Notably, the government was unable to articulate whether probable cause existed for the issuance of any search warrants without relying on defendant's illegal arrest. (*See* Tr. 18-19). Thus, it is highly unlikely that the agents would have been able to obtain a warrant without relying on defendant's illegal arrest and its fruits. The government ultimately abandoned their inevitable discovery argument at oral argument. (*See* Tr. 18-19). Indeed, in light of the foregoing, such a theory is unavailing and need not be addressed further.

The government further argued that the agents' observations of various people, including defendant, going in and out of the building and a surveillance camera located outside the building near the third floor[2] demonstrated that the building was suspect. This additional evidence, argues the government, provided probable cause for the search of defendant's

---

[2] There was no evidence of any drug activity by any of these individuals in or out of the building or the defendant's apartment. A search of the surveillance camera on the consent of an unarrested, uncharged third-party did not reveal any evidence of drug activity by defendant or anyone else.

7

apartment, absent defendant's illegal arrest. (*See* Gov't Mot. to Reopen Supp. Hrg. at 3.) This, without more, would be insufficient evidence upon which a court may issue a search warrant for defendant's apartment. Furthermore, all of this is evidence already in the record of the suppression hearing. As such, there is no need to reopen the hearing.

B. **Attenuation**

The court understands the government's position to be that a *Brown* attenuation analysis is inapplicable to the case at hand as it was defendant's wife who consented to the search of their apartment and that *Brown* and its progeny apply only when the individuals who are subject to unlawful police conduct, whether it be a stop, search, seizure or arrest, subsequently give consent. (*See* Gov't Mot. to Reopen Supp. Hrg. at 5-6.) The court notes that an extensive search revealed no cases in this circuit in which a court applied a *Brown* analysis to a consent given by one spouse following the arrest of another. However, the mere fact that there is no precedent on all fours of the instant case does not mean that a *Brown* attenuation analysis does not govern or control here as each case is decided on its own facts. Moreover, under these circumstances, a *Brown* attenuation analysis is highly appropriate. *See United States v. Maez*, 872 F.2d 1444, 1456 (10th Cir. 1989) (holding that a wife's consent following the unlawful arrest of her husband was not sufficiently attenuated under *Brown* to purge the taint of the unlawful arrest). Further, the Second Circuit specifically remanded the instant action to this court to address attenuation under *Brown*. *See Valentine*, 539 F.3d at 96. Accordingly, the court will consider the *Brown* factors in the context of this case.

The first *Brown* factor—whether the law enforcement officers gave a *Miranda* warning—is not particularly pertinent as it was Morales, initially not a suspect, who consented and not the unlawfully arrested defendant. The law enforcement officers gave defendant a *Miranda* warning

8

(H. 48-52), but did not warn Morales, who was neither a suspect nor under arrest at the time they requested consent. Thus, the failure to "Mirandize" Morales is of no detriment to the government. Notably, however, none of the officers or the consent form Morales signed advised that she had the right to refuse to consent to a search their home. (H. 100, 103-05, 143.) At the suppression hearing, a government witness conceded that, had she refused, the officers would not have conducted a warrantless search. (H. 108.) At the hearing, Agent Yoos explained that, pursuant to an internal DEA policy, DEA officers never inform individuals of the right to refuse. (H. 143.) The court finds this policy troubling, and perhaps not the better practice, but notes that it is permissible under the law.[3] Some courts have considered the failure to advise of the right to refuse consent to search in the context of evaluating this first *Brown* factor. *See United States v. Singleton*, 06-CR-6234L, 2008 WL 4935401, at *6 (W.D.N.Y. Nov. 12, 2008) (holding that the first *Brown* factor weighed in the defendant's favor as the defendant "was neither advised of his *Miranda* rights, nor advised of his right to refuse consent" to search); *see also Oguns*, 921 F.2d at 447-48 (discussing temporal proximity and noting that the consent to search form the defendant signed indicated that he had the right to refuse to consent to a search).

---

[3] There is no precedent requiring law enforcement officers to inform individuals of this right; however, it is one factor courts consider when assessing the voluntariness of a consent to search. S*ee United States v. Isiofia*, 02-CR-520 (HB), 2003 WL 21018853, at *7 (S.D.N.Y. May 5, 2003) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). This court previously held that Morales voluntarily consented. *See Valentine*, 2006 WL 197005, *6-8. The court does not interpret the Circuit's opinion as disturbing that finding. The government contends that the voluntariness of the consent dissipates the taint of the unlawful arrest. (*See* Gov't Mot. to Reopen Supp. Hrg. at 6-7.) The voluntariness of the consent and its attenuation from the arrest are two distinct issues and the court does not interpret the case law as requiring a finding of attenuation when a court finds the consent to be voluntary. *Cf. Brown*, 422 U.S. at 601-02 ("[E]ven if the [defendant's confession] in this case were found to be voluntary under the Fifth Amendment, the Fourth Amendment issue remains. In order for the causal chain between the illegal arrest and the statements made subsequent thereto to be broken, *Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.'"); *Oguns*, 921 F.2d at 447-48 (evaluating the consent to search an apartment both for attenuation and voluntariness).

The second and third factors—temporal proximity and intervening circumstances—weigh heavily in defendant's favor. The law enforcement officers arrested defendant on the street outside of his apartment. (H. 196.) When they initiated the arrest, Morales was asleep. She was awakened by a neighbor shouting to her that the police were arresting defendant. (H. 306.) One officer testified that he observed Morales nervously watching the struggle to arrest defendant through a window. (H. 221, 240-41.) Defendant struggled for several minutes with five or six officers of sizable stature before they subdued him. (H. 168, 194-95, 217, 257-59, 277-78.) As a result of this struggle, defendant suffered a wound to his head, which began bleeding and required emergency medical care. (H. 170, 194-95, 219, 236-37.)

Once the officers subdued defendant, they searched his car. (H. 169, 195-96.) Agent Yoos, along with other officers, proceeded to the apartment defendant shared with Morales. (H. 98, 136.) The officers immediately sought Morales's consent to conduct a security sweep; however, it is unclear whether that sweep occurred before or after Morales signed the consent form. (*Compare* H. 130, 242, 316-17, *with* H. 130, 136-37.) The officers described her as looking "concerned" when they entered the apartment (H. 101, 220, 240), but "calm" during the search (H. 205).

Based on the record, the court finds that the officers' request to enter the apartment followed immediately on the heels of defendant's illegal arrest. (H. 124, 128, 129, 220, 260, 322-23.) There is no evidence of any intervening events whatsoever in the record. In fact, one officer testified that he was out of breath from the struggle with defendant, immediately regained his composure, and then proceeded directly to the apartment to assist Agent Yoos. (H. 260, 278-79.) The government did not seek to present any additional evidence with respect to the timeline presented.

Finally, the fourth factor—the flagrancy of the violation—weighs only slightly against the government. On appeal, the Second Circuit held that defendant's arrest was unsupported by probable cause. *See Valentine*, 539 F.3d at 95. This holding indicates that the defendant's arrest violated the law; however, the record indicates that none of the officers acted in bad faith before, during, or after defendant's arrest. At worst, the law enforcement officers acted impatiently and failed to take full advantage of their ability to develop the investigation. For example, they could have followed "normal" Federal Express delivery procedures by attempting to effect the controlled delivery on a different day. This lack of bad faith mitigates against finding a flagrant violation of the law. The government asserts that pursuant to internal DEA policies, it regularly seeks consent for searches when controlled deliveries fail, and that the DEA might have sought Morales's or defendant's consent irrespective of whether the DEA arrested defendant; therefore, the court should not preclude admission of the firearms. (*See* Gov't Mot. to Reopen Supp. Hrg. at 4.) The court does not dispute the existence of the DEA policy or its asserted contents; however, the court cannot base its holding on speculation as to what the DEA might have done. It is, nevertheless, abundantly apparent from the circumstances here that the officers did intend to or acted in a manner indicating their intention to exploit defendant's arrest.

Upon consideration of the totality of the circumstances, the court is hard-pressed to render any holding other than that Morales's consent was tainted by defendant's unlawful arrest. *See Ceballos*, 812 F.2d at 49-50 (holding that a consent to search, given a few minutes after an unlawful arrest, was "too closely connected in context and time to the illegal arrest to break the chain of illegality"); *Delgado*, 797 F. Supp. at 220-21 (suppressing evidence obtained by a consent search conducted just thirty minutes after an unlawful detention, during which no intervening events occurred, and the officers failed to warn the defendant of his *Miranda* rights);

*United States v. Karagozian*, 715 F. Supp. 1160, (D. Conn. 1989) (noting that "[n]othing intervened to purge the taint of the illegal arrest"). The consent occurred almost immediately after the unlawful arrest and there were no intervening events. These two factors weigh so heavily in defendant's favor that the lack of a flagrant violation of the law does little to change the court's opinion. A finding of attenuation "ordinarily involves [a] showing that there was some significant intervening time, space, or event," *see Vasquez*, 638 F.2d at 528, of which there was none in this case.

## CONCLUSION

For the reasons set forth above, defendant's motion to suppress is granted and the government is precluded from introducing the evidence recovered from defendant's apartment as fruit of defendant's unlawful arrest.

SO ORDERED

DATED:     Brooklyn, New York
                December 24, 2008

                                             _____/s/_____
                                                   DORA L. IRIZARRY
                                               United States District Judge